IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

WESTERN DISTRICT, SEPTEMBER TERM 1834.

## Burchfield *against* M'Cauley.

In ejectment for land west of the *Alleghany river*, where a period of *thirty years* has elapsed, the agency of an assistant to the deputy surveyor of the district may be inferred from circumstances proved. Proof of his formal appointment by writing or by parol is not indispensably necessary.

Where it is first proved by witnesses, who were present on the ground, that a survey was made by a person reputed to be an assistant to the deputy surveyor; a draft of the survey purporting to be made out by such assistant, and found, after the decease both of himself and the deputy surveyor, amongst other official papers in the deputy surveyor's office, would be admissible evidence of the survey. So also is a copy, made out by a subsequent deputy surveyor, where the non-production of such original draft has been satisfactorily accounted for.

Whether a survey was or was not made, and also whether there has been an abandonment under the act of the 3d of April 1792, are questions of fact to be decided by the jury.

Continuity of personal resident settlement on land lying west of the Alleghany river, beyond the term of five years, is not necessary in order to preserve the right of an actual settler.

WRIT of error to the court of common pleas of *Alleghany* county. This was an action of ejectment, brought in the court below to November term 1819, by the defendants in error, to recover the possession of three hundred acres of land, situate in Pine township on the head waters of Pine creek west of the Alleghany river. Both

III.——B

[Burchfield v. M'Cauley.]

parties claimed by virtue of settlements, alleged to have been made on the land in dispute, under the act of the 3d of April 1792.

On the trial of the cause in May 1831, the heirs of M'Cauley, the plaintiffs below, gave evidence, showing that their father in his lifetime came first upon the land in June 1800 or 1801. At this time there was a small cabin on the land, about thirteen or fourteen feet square, that had been put up in 1794 by a man of the name of Jonathan Cochran, who likewise planted some potatoes on it in May 1796. He moved his family into the cabin in the month of October of this latter year, where he lived with them till the approach of winter, when he left the cabin and the land, and went to reside with one M'Coshlin, in the neighbourhood, during the winter. In the spring of 1797 he returned with his family to the cabin on the land in dispute, and resided there till the spring of 1798. Then he gave the possession of the cabin and land to one Samuel Hoover, probably under a contract for the sale of them. Hoover, however, died during the summer of that year, and Cochran returned and took possession of the cabin and land in the winter following. In the month of February or March of that same winter he quitted the possession again, and delivered it to one Jonathan Hoover under a contract for the sale of it ; but Hoover afterwards, not being able to pay the purchase money agreed on for the land, conveyed the hundred and fifty acres of it including the cabin and improved part to Cochran, who on the same day sold and conveyed the one hundred and fifty acres to Adam Burchfield the father of the defendants below, now plaintiffs in error. When Hoover quitted the possession of the land, after making the conveyace to Cochran, the door of the cabin was locked and the key given to one Cisna, who resided in the vicinity and was said to be the agent of Hoover. Upon M'Cauley's first coming into the neighbourhood of the land, which was some time after Hoover quitted the possession of it, he proposed teaching English, and to keep a school for that purpose ; and the cabin being unoccupied, Hoover and Cisna consented that he should take the possession of it, and accordingly gave up the key of the lock on the door that it might be opened for him. This was in June 1800 or 1801, as it was said, when M'Cauley took possession of the cabin by the consent of Hoover and Cisna, and in the fall following the family of M'Cauley, consisting of a wife, two sons and one daughter, joined him in the cabin, where they all resided until he, in the course of two or three years afterwards, erected another house upon the land, one story and a half high and about eighteen by twenty feet in width and length. In the same fall that his family came to live with him on the land, he with the aid of his employers, to keep a school, erected a school house upon the land, where he taught the children of the neighbourhood for a number of years, and was afterwards succeeded in the same business by one of his sons, who taught about two years. M'Cauley, the father, continued to reside upon the land with his family twelve or thirteen years, claiming three

[Burchfield v. M'Cauley.]

hundred acres and paying the taxes assessed on it. During that time, with the assistance of one of his sons, he cleared, fenced and cultivated from seven to eight acres of the land. The son also built another dwellinghouse upon the land, in which he resided until his father left the land, when he moved into the house that his father had built and occupied. He continued to reside therein and to cultivate the land afterwards about two years, and then left it, perhaps in the year 1815, according to the testimony of some of the witnesses. Some of the chain carriers and others, witnesses produced on the part of the plaintiffs below, also testified, that, about the year 1801 a man of the name of Fenton, who, one of the witnesses said, was a deputy of Col. Neville the then deputy surveyor of the district in which the land lay, made a survey of it for Cornelius M'Cauley; and that he made other surveys of land lying around near to that for Neville; but had long since left this section of the country and was believed to be dead. That a draft of a survey, dated the 25th of September 1801, containing three hundred acres, and embracing the land in dispute, which purported to have been made by Thomas Fenton, came into the hands of David Coon in 1809, when he was appointed deputy surveyor of the district, with other papers, which he received as belonging to the office, either from colonel Neville or Hazlit, the successor of colonel Neville in office. That Neville and Hazlit were both dead. Coon, who was a witness, and testified to his having received this draft as an official paper either from Neville or Hazlit, but could not tell which, likewise testified that he did not know what had become of it, but thought he had delivered it over with other official papers to his successor in office Mr Beatty. Mr Beatty, also being a witness, testified that he never saw it, but had seen Fenton's name on other drafts in the office. The succeeding deputy surveyors to Mr Beatty were all called as witnesses, and testified that they had never seen nor known any thing of the draft. A copy of it, made and given by David Coon, while it was in his possession during the time of his being deputy surveyor, was then produced by the plaintiffs below, and after being proved by Coon to be a true copy, was offered by them in evidence, but objected to by the defendant's counsel. The court, however, overruled the objection and admitted the copy to be given in evidence, which was excepted to by the defendant's counsel. The plaintiffs below further showed from the records of the court, that in 1809, Adam Burchfield, the father of the defendants below, brought an action of ejectment for the land in dispute against Cornelius M'Cauley, the father of the plaintiffs, which was depending until 1813, when Burchfield suffered a nonsuit.

On the part of the defendants below, evidence was given showing the settlement made on the land by Cochran, and the disposition made of it by him, to be the same as already mentioned. And further that two men, of the names of Sutton and Marxay, first cleared about three quarters of an acre of the land before Cochran came on

[Burchfield v. M'Cauley.]

it; and that he cleared from half an acre to two acres, which was all that ever was cleared of it, according to the evidence, until M'Cauley extended it. That in November 1816, after the M'Cauleys had quitted the actual possession of the land, and the houses and fences had become much dilapidated, according to the testimony of James M'Elwayne, he, as an intruder, entered upon the land and took possession of it intending to hold it as a settler in his own right. With this view he kept possession and resided upon it until February 1818, when he took a lease of it from Adam Burchfield. After this he continued to occupy the land as tenant of Burchfield until the beginning of 1824, when he surrendered it to the plaintiffs in error. M'Elwayne also testified that M'Cauley lived five or six miles off from the land when he (M'Elwayne) first went on it. That during the time he lived on the land he never saw M'Cauley on it, and had no conversation with him in relation to it; and that he paid the taxes assessed on the land for two of the years that he resided on it.

The following points were submitted to the court below by the defendants' counsel.

1. Cornelius M'Cauley the elder entered upon the land in dispute without any assertion or pretence of title in himself, and under Hoover who then claimed to be the owner. M'Elwayne testified that two acres were cleared at the time of M'Cauley's entry. There was a cabin on the land. The improvement, commenced as early as 1796, had been prosecuted from time to time by residence and labour, until about a year before M'Cauley's entry. There was no abandonment by Hoover. He was imprisoned; and his family left the land from necessity, locking up the house. M'Cauley did not allege an abandonment then, and his heirs cannot do it now. His entry and possession were in express subserviency to Hoover's title. Upon this state of the facts, taken in connection with the other facts of the case, the plaintiffs cannot recover.

2. The fact that Hoover's actual settlement was not completed, does not vary the relation of the parties or enable M'Cauley to claim on any supposed abandonment by Hoover or Burchfield. The law does not exact diligence in the landlord against his tenant. M'Cauley's improvement enured to the benefit of Hoover and Burchfield.

3. If M'Cauley, after obtaining possession with the permission of, and under Hoover, through Cisna his agent, and thus holding the land a year or two, set up a claim in himself as an original settler, he could not in this way affect Hoover or Burchfield with the consequences of an abandonment. But if this were possible, it could only take place after actual notice to Hoover or Burchfield of his (M'Cauley's) adversary possession.

4. From the facts in the case, taking them as testified by the witnesses, in connection with the draft shown by plaintiffs, there is not legal evidence of a survey by plaintiffs.

5. Admitting a survey for plaintiffs, their settlement and survey might be abandoned, and if the jury believe M'Cauley and his son

[Burchfield v. M'Cauley.]

left the land with the intention of not returning to it, the right of the M'Cauleys was gone. The fact of their possession being vacant for two years, and in the condition stated by M'Elwayne, is very strong if not conclusive evidence of abandonment, and this evidence is fortified by the circumstance that he lived on the land until this suit brought, without any objection or warning from plaintiffs.

6. The survey of plaintiffs enured to the benefit of defendants. The same remark applies to the plaintiffs' settlement.

7. Supposing the testimony of the witnesses for plaintiffs to be true, and a legal survey for them shown, they cannot withstand defendants' title; and from the facts in evidence, on both sides, the right of defendants is good against plaintiffs.

A verdict and judgment were rendered for the plaintiff, under the direction of the court (Shaler president), in answer to defendant's points.

The following errors were assigned.

1. There was no legal evidence of a survey having ever been made by the proper officer, of the land in controversy.

2. The court erred in submitting the question of survey or no survey as a matter of fact to be decided by the jury.

3. There was error in permitting the copy of the survey marked A, to go to the jury.

4. There was error in the charge of the court in their answers to the several points submitted by defendants' counsel.

*Dallas* and *Forward,* for the plaintiffs in error.

1. There is no testimony exhibited by the record going to show, or even to raise a reasonable presumption, that the paper, permitted by the court to go to the jury, is a copy of a public document; nothing to negative the belief that it is merely a private paper. The copy of a survey not recognized by any official authority, is clearly not evidence. The paper in question purports to have been copied by a man named Fenton, whose public character nowhere appears, unless it be inferred from the single circumstance that his copy of this survey, and his name upon other papers, had been found and seen amongst the old papers of the former deputy surveyor of the county. There was no testimony to show that Fenton had ever acted as the assistant of colonel Neville, the deputy surveyor. The survey received by the court below was never returned to the land office. It bears nowhere the stamp of official sanction; and the court below ought therefore at once to have rejected it. A survey stated to have been made by order, without any proof of such order, cannot go to a jury for them to presume that there had been such order. There was no evidence of a survey upon the ground. The successors in the deputy surveyor's office, Messrs Coon, Beatty, Hilands and M'Nevin, know nothing of the original survey, and are ignorant of Fenton's alleged agency for their predecessor, colonel Neville. Wilson *v.* Stoner, 9 *Serg. & Rawle* 39 ; Burd et al *v.* Sea-

bold, 6 *Serg. & Rawle* 138; Smay *v.* Smith's Executors, 1 *Penns. Rep.* 4.

2. The plaintiffs below claimed under an alleged actual settlement made by their ancestor, Cornelius M'Cauley. What description of actual settler was M'Cauley? Was he an actual settler under the act of 1792? If, from the testimony, he was not, it then became a matter of law upon which the court ought to have charged the jury distinctly. At all events, the requisitions of law, constituting an actual settlement, ought to have been explained to them. The charge of the court leaves too much to inference and conjecture. By the proviso of the third section of the act of 30 December 1786, *Purd. Dig.* 526, we are told what shall constitute an actual settlement; and by the ninth section of the act of 3d April 1792, *Purd. Dig.* 530, the requisitions upon an actual settler are again stated. The definition of an actual settlement there given, is good under both the acts of 1786 and 1792. Pennsylvania *v.* Huston et al., *Add.* 335. It is important to examine minutely the facts in relation to the character of the settlement begun, continued and ended in Cornelius M'Cauley; because what constitutes an actual settlement must depend upon the circumstances of each case. Ewalt's Lessee *v.* Hilands, 4 *Dall.* 161. The testimony unquestionably discloses the fact that M'Cauley went in under Hoover, for the temporary purpose of keeping a school. He can then only be viewed as the tenant at sufferance of Hoover. In its inception his entry had none of the characteristics, no pretence, of an actual settlement adverse to any one. He entered as our tenant, not in hostility to us. Can he then as a tenant be permitted to dispute his landlord's title?

3. The doctrine of abandonment was, erroneously by the court below, made to bear against the plaintiffs in error. Its application is more palpable against M'Cauley who left the property a complete wreck, and Burchfield paid the taxes upon it for many years afterwards.

*Fetterman,* for the defendants in error.

With regard to the testimony of M'Elwayne, he was an interested witness from having once sold the land and given a deed with a general warranty. First, then, was the copy of the survey evidence? This was a matter of long standing. The trial took place *thirty years* after the survey was made. Wallace swears that Fenton was Neville's deputy, and surveyed his (Wallace's) own tract of land. We produced as strong evidence of the survey as the nature of the case admitted. Packer *v.* Gonzalus, 1 *Serg. & Rawle* 526; Leazure *v.* Hillegas, 7 *Serg. & Rawle* 313; Hoover et al. *v.* Gonzalus et al., 11 *Serg. & Rawle* 314. What constitutes a survey? The draft, or the actual measurement of the ground? Certainly the latter. The draft is a mere evidence of the survey. This was not a case in which it was necessary to return the survey to the land office.

[Burchfield v. M'Cauley.]

Then as to the question of abandonment. It is true M'Cauley entered in pursuance of the arrangement between himself and Cisna, the agent of Hoover. In 1801, however, he took the advice of John Woods, Esq., who stood deservedly eminent in his profession as a lawyer, claimed as an actual settler, got Gen. Neville, the deputy surveyor of the district, to have a survey made, and determined to hold adversely. From that time he held until 1809, when Burchfield brought an ejectment, M'Cauley having in the meantime erected the requisite improvements, and cleared the proper quantity of land to bring himself within the provisions of the act of 1792 as an actual settler. Under these circumstances the charge of the court left the question of abandonment to the jury. Why did not the gentleman show wherein the error of the charge consisted, instead of dwelling upon the abstract principle of law? The court was correct, else where would be the use of juries, that admirable feature in American jurisprudence? Miller *v.* M'Brier, 14 *Serg. & Rawle* 382; Willison *v.* Watkins, 3 *Peters* 49; Lessee of Mobley et. al. *v.* Oeker, 3 *Yeates* 200; Lessee of Clark *v.* Hackethorn, 3 *Yeates* 269; Chambers *v.* Mifflin, 1 *Penns. Rep.* 75; Addleman *v.* Masterson, 1 *Penns. Rep.* 454; Star et. al. *v.* Bradford, 2 *Penns. Rep.* 384. What right had Hoover to the land? a mere incipient title. He abandoned the land; and M'Cauley's tenancy expired at the end of the quarter for which he was engaged to teach.

The opinion of the Court was delivered by

KENNEDY, J.—The question growing out of the first error assigned seems to be involved in the question presented by the third error, which is, was the copy of the draft, purporting to have been made by Thomas Fenton, admissible as evidence? for if it was, then there was legal evidence given of a survey made by a proper officer; and the first error would not be sustained.

I shall therefore consider these two errors together as one. It must be borne in mind that the location of the land in dispute is west of the Alleghany river, and therefore comes under the peculiar provisions of the act of the 3d of April 1792. A warrant in the case of a settler under this act is not necessary in order to authorize the deputy surveyor of the district in which the land lies, to make a survey. The *eighth* section directs that "the deputy surveyor of the proper district shall, upon the application of any person who has made an actual settlement and improvement on lands lying north and west of the rivers Ohio and Alleghany and Conewango creek, and upon such person paying the legal fees, survey and mark out the lines of the tract of land to which such person may, by conforming to the provisions of this act, become entitled by virtue of such settlement and improvement." By the third section of the act of the 30th of December 1786, a settlement on land is defined to be "an actual, personal, resident settlement, with a manifest intention of making it a place of abode, and the means of supporting a family,"

[Burchfield v. M'Cauley.]

&c. And by the ninth section of the act of 1792, it is required, in order to complete the settlement and improvement made under that act, that there shall have been cleared, fenced and cultivated, at least two acres for every hundred acres contained within one survey, and a messuage erected thereon for the habitation of man, and the residence of a family thereon for the space of five years next following the settler's first settling of the same. Now if the evidence given by the heirs of M'Cauley on the trial is to be credited, Cornelius M'Cauley, their father, in 1801, had an actual personal resident settlement upon the land in controversy; and under the eighth section of the act of 1792, had a right to call upon the deputy surveyor of the district to come and make a survey for him of the land upon which he was settled. At this time it appears from the evidence, that colonel Neville was the deputy surveyor of the district in which the land was situate, and that Thomas Fenton, as one of the witnesses said, was his deputy, and others of them, that he made surveys for him. I do not consider it indispensably necessary that the agents or assistants of deputy surveyors should be appointed by writing either under or without the seal of the deputy surveyor; nor is it requisite, in order to establish such agency, that there should be evidence given, showing a formal or direct appointment of such agent or assistant by parol or otherwise. It may be inferred from circumstances proved; Burd v. Miller, 6 *Serg. & Rawle* 138; and especially after a lapse of thirty years as was the case here. In Bill v. Levers, 3 *Yeates* 25, it was said by the court, "that the authority of an assistant to make a survey should not be too nicely scrutinized after so great a lapse of time as twenty-seven years." And in that case, it having been proved that John Seely had transacted business in making surveys for James Scull, the deputy surveyor, whose commission expired by his death in December 1772, when Jasper Scull was appointed his successor, and a survey having been made by Seely in May 1773, without any authority being shown from Jasper Scull the then deputy surveyor, the court said that as it appeared that Seely had transacted business under a *reputed* authority from James Scull while in office, it might be *presumed* that he was the agent of Jasper Scull, the immediate successor, in May 1773, when the survey was made, though the authority did not then appear. It is obvious that if such evidence were not to be considered admissible and deemed sufficient to establish an agency in such cases, after a lapse of thirty years, it would be difficult if not impossible, in a majority of cases, to show it at all, from the want of better that must necessarily arise from so great a lapse of time, even where better once existed; and consequently many titles to lands, considered indefeasibly good, might be objected to on this ground, which would produce much evil, and as it appears to me, no good whatever. Neither do I think it has been the practice on the trial of actions of ejectment, in order to give validity to a survey, to prove that the person acting in the character of deputy surveyor, by whom, as such, it was made, was

[Burchfield v. M'Cauley.]

duly appointed or commissioned, by producing his commission and giving it in evidence; nor yet by giving any direct evidence of its existence. Evidence that he acted as such, and was generally recognized and reputed to be such an officer, has been pretty uniformly received and held sufficient. Then whether colonel Neville was the deputy surveyor of the district in which the land in question lay; and whether Thomas Fenton was his assistant at the time the survey was made, were questions of fact proper for the jury to decide from the evidence given them; and it appears to me that it was amply sufficient to authorize them to decide both these questions in the affirmative. That being the case, was proper evidence also given to show that colonel Neville, by himself or his assistant, had a sufficient authority, on the 25th of September 1801, to make a survey of the land in dispute for Cornelius M'Cauley? We have seen that by the express and positive direction of the eighth section of the act of 1792, an actual personal resident settlement on the land is made a sufficient authority for this purpose; and that Cornelius M'Cauley had such a settlement upon the land at that time was abundantly proved by the testimony of witnesses who had seen it often, which was certainly the very best evidence that the nature of the thing would admit of. Then as to the proof of the fact that a survey was made by Fenton, as the assistant of colonel Neville; it was testified to by one of the chain carriers, and others who were present and saw him making it. After such evidence being given, without any thing appearing that would impugn or detract from its credit in the slightest degree, it cannot be fairly contended that a draft of the survey purporting to be made out by Fenton, and proved to be in his handwriting, he and Neville both being dead, and found in Neville's office among his official papers, would not be admissible evidence. I take it that it would be clearly admissible evidence to go to the jury to show the date, location and extent of the survey. But it is objected, that as no proof was given that the original draft purporting to be made by Fenton was in his handwriting or actually made by him, it ought not therefore to have been received in evidence, and that in this respect it is distinguishable from every thing that has been heretofore judicially determined in the reported cases on the subject. Allowance must be made for the lapse of time in this case, which most probably has rendered such proof impossible, for it would seem from the evidence, that those who must have been acquainted with the handwriting of Fenton are dead, and it does not appear that any one saw him make the draft who could be called to prove the fact. Under these circumstances it would scarcely be reasonable to require such proof. That this original draft was made by him at the time it bears date, may well be inferred from the evidence given that he was on the ground about that time, while M'Cauley was living on the land; made a survey for him; and that the draft itself came either from the hands of colonel Neville, the deputy surveyor, or his successor, as an official paper, with other official papers, to Da-

III.—C

[Burchfield v. M'Cauley.]

vid Coon in 1809, when he was appointed the deputy surveyor of the district. Neville and Hazlit being both dead, it was impossible to have their testimony, and therefore no presumption can be made against the plaintiffs below from the want of it; as possibly might have been, had they been living within the jurisdiction of the court, but not produced. The natural, and indeed, as it seems to me, the necessary inference then seems to be, that the draft was recognized and considered by colonel Neville as an official paper, preserved by him as such, and as such delivered over by him either to Hazlit, his immediate successor in office, or to Coon, who succeeded Hazlit. But did the evidence given of it show it to be an official paper—for if it did, then according to the rule laid down in a number of cases, and recognized and qualified in Miller *v.* Carothers, 6 *Serg. & Rawle* 221, it would, if it could have been produced, have been admissible evidence on the trial? The rule, as laid down and qualified in Miller *v.* Carothers, is, " that all papers found among the official papers of the deputy surveyor, may fairly be supposed to be official papers (unless the contrary be proved), *provided there were any orders in his hands, to the execution of which the papers might relate.*" The late chief justice, in stating the proviso or qualification to this rule, uses the word " orders," because the case then before the court was that of land lying in that part of the state, where some written authority or order from the land office was necessary, in order to give a survey made of the land an official character; but in the case here before us, the settlement and improvement of M'Cauley on the land at the time, under the eighth section of the act of 1792, of which plenary evidence was given, supplied the place of a written order from the land office authorizing it, and made the survey *official.*

Having shown now, that the original draft would have been admissible evidence in case it could have been produced, it follows of course, the non-production of it having been satisfactorily accounted for, that the copy of it, being first proved to be a true copy, was admissible as the next best evidence.

The second error is, that the court below " erred in submitting the question of survey or no survey as a matter of fact to be decided by the jury." I can perceive nothing in the charge of the court on this point that is not in perfect accordance with what has ever been received as the law on this subject. The court explained very correctly, and stated to the jury in very clear and intelligible terms, what constituted an official survey in the case of a settler on land west and north of the Ohio and Alleghany rivers and Conewango creek, by telling them that it was " one made by the deputy surveyor of the district or his authorized agent, and whether such survey had been made was always matter of fact for the jury to determine." I must confess that I have never heard it asserted before, that the question whether a survey was made or not was not one of fact to be passed on and decided by the jury. It is the province of the court to say what is necessary to be done in order to constitute

[Burchfield v. M'Cauley.]

and make an official survey, but whether done or not, is purely a question of fact that must be referred to the jury to be settled by them.   The rule of law on this subject is, *ad questionem facti non respondent judices, sed juratores.*

The next and last error is, that the court below erred in their answers to the several points submitted on behalf of the plaintiffs in error.   After having read the charge of the court with attention, it appears to me that, so far as those points were material to the issue between the parties, the court answered them in their charge very fairly, fully and correctly.   The first point relates to the manner in which M'Cauley obtained possession first of the land.   That having got it by the consent of Hoover, he was ever after, as long as he held it, to be considered the tenant of Hoover and of those claiming under him.   The court, however, in substance told the jury, that if from the evidence they should be satisfied that M'Cauley, after he took possession, disclaimed holding the land as the tenant of Hoover and of Burchfield, who derived his claim from Hoover and Cochran, and that he went on and erected a suitable messuage or dwellinghouse for the habitation of himself and his family, cleared, fenced and cultivated at least two acres for every two hundred contained within his survey, and continued his residence thereon with his family for the space of five years and upwards, intending to claim the land in his own right and for his own use, and Burchfield was aware of all this and made no claim during the interim to the land; they might presume he had abandoned his right to it, whatever it was; and if so, their verdict ought to be in favour of the plaintiffs below.   In this I can perceive no error.   The right of Burchfield, derived from Hoover and Cochran, was of a very imperfect and merely inceptive character, and therefore might readily be abandoned; and the court, as it seems to me, very properly left it as a question of fact, to the jury, to determine whether he had not relinquished it; and if he had, there could be no doubt of the right of M'Cauley's heirs to recover the possession of the land in question.

It was also contended on the trial of the cause, by the counsel of the plaintiffs in error, that the circumstances under which it was proved that M'Cauley quitted the possession of the land, and his neglect of it for something like two years before M'Elwayne took possession of it, furnished strong if not conclusive evidence of his intention to abandon his right to it; and that the court below erred in not instructing the jury to that effect.   It would have been error in the court if such instruction had been given; for, it appearing from the evidence that M'Cauley had erected a messuage on the land suitable for the habitation of himself and his family, that he had resided thereon continuously for the space of thirteen or fourteen years, at least nine years beyond the time required by the third section of the act of April 1792, and that he had also cleared, fenced and cultivated two acres and more for every hundred contained within his survey, he thereby became entitled, under the provisions of that act,

[Burchfield v. M'Cauley.]

to hold the land, whether he continued to reside on it afterwards or not, against all the world except the commonwealth, which, in case of his neglect to apply for a warrant and pay the purchase money due for the land to her within the space of ten years after the passage of the act of 1792, might have granted it to any other upon his paying the purchase money, by a warrant reciting the default of M'Cauley. Continuity of a personal resident settlement on the land lying north and west of the rivers Ohio and Alleghany and Conewango creek beyond the term five years, is not necessary under the act of 1792, in order to keep alive and preserve the right of the actual settler, as it is under the acts of 1786 and 1794. The mere leaving, therefore, of the possession by M'Cauley after he had fulfilled and performed every thing required by the act of 1792 to complete his settlement and to acquire his right thereby to the land, until he commenced, or rather his heirs after his death commenced, this action to recover the possession again, could not be considered an abandonment or forfeiture of their right.

Judgment affirmed.